## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| KRISTEN MCDOWELL,           )<br>                             )<br>    Plaintiff,               )<br>                             )<br>    v.                       )<br>                             )<br>COMMISSIONER OF SOCIAL       )<br>SECURITY,                    )<br>                             )<br>    Defendant.               ) | Case No. 08-cv-1077 |

## O P I N I O N and O R D E R

Before the Court are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Motion for Summary Affirmance (Doc. 13). For the reasons set forth below, Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED.

### BACKGROUND

**I. Procedural History**

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) alleging an onset date of June 1, 2002 (Tr. 63) due to interstitial cystitis, renal stone disease, and depression (Tr. 103). The claim was initially denied (Tr. 46) and upon reconsideration (Tr. 51). Plaintiff requested a hearing before an Administrative Law Judge (ALJ) (Tr. 54). ALJ Melvin A. Padilla denied her claim on January 22, 2007 (Tr. 28-42). Her request for review was denied by the Appeals Council on January 23, 2008, rendering the ALJ's decision final (Tr. 6). This lawsuit follows.

## II. Medical History

In January, 2004, Dr. Mary Lou Zwiesler, Plaintiff's family doctor indicated that she has been under her care since 1993, although she had not examined Plaintiff in over a year (Tr. 445). The doctor noted that Plaintiff had a long history of renal stone disease and had a recent diagnosis of interstitial cystitis (Tr. 445). Dr. Zwiesler stated that the renal stone disease and interstitial cystitis were being treated by a urologist, Dr. Howard B. Abromowitz (Tr.443). Dr. Zwiesler was treating Plaintiff for her depression and stated that it was stable on medication, that Plaintiff had a "bright" affect at the last examination, and that it posed no physical impairments (Tr. 443-444). It appears that Plaintiff called the doctor's office a number of times in 2004 to acquire refills on medication (Tr. 437-441).

When Plaintiff did see Dr. Zwiesler, on April 14, 2005 (related to bladder pain),[1] she again noted that Plaintiff's depression, while chronic was stable (Tr. 515). Dr. Zwiesler also stated in the progress note that Plaintiff reports that: she was in "a lot of pain," that her "bladder pain" is causing difficulty in caring for her children, that she is only pain free for 2 to 3 hours in the morning, that she is having a hard time with stairs, and that she is having trouble concentrating and remembering details (Tr. 515). In a May 14, 2005 letter Dr. Zwiesler outlined Plaintiff's medical condition and stated that she could not give a prognosis as to Plaintiff's urologic condition because she was not managing that condition (Tr. 433). She did state, however, that the prognosis of Plaintiff's depression (which she was treating) "is good for continued good functioning on the Effexor." (Tr. 433).

---

[1] Plaintiff was examined by Dr. Zwiesler on October 13, 2004 for an annual pelvic exam (Tr436) and on January 14, 2005 for low back pain associated with a cough (Tr. 435)

2

Nonetheless, Dr. Zwiesler stated that she believes Plaintiff is "disabled totally" because she only has a few hours of pain free days and because she has told the Doctor that she has decreased concentration (Tr. 434). In the doctor's opinion, this lack of concentration and a self-reported forgetfulness regarding details would negatively affect any job she may attempt (Tr. 434).

On August 2, 2005, Plaintiff called in to complain of pain and request pain medications (Tr. 514). She cancelled two appointments in September, 2005 (Tr. 513) and over the next few months either called her doctor to request refills on prescriptions or cancelled/missed appointments (Tr. 508-514). The next time that she saw Dr. Zwiesler was on March 9, 2006 because of insomnia (she prescribed Ambien) (Tr. 507).

Dr. Abromowitz has been treating Plaintiff since January, 1997 (Tr. 377). In his opinion (as of March 22, 2005):

> Kristen has certainly been troubled with significant medical problems. She has significant renal stone disease and has multiple renal stones bilaterally. This will be an ongoing problem. In terms of her interstitial cystitis this does flare up multiple times. She is much improved over what she was but holding down an eight hour a day job will be quite difficult. There are some potential jobs that she potentially could hold but those jobs would require frequent bathroom privileges and breaks and most employers would not be willing to have an employee that would require this much time off. She requires intermittent intervention for her stone disease as well as her interstitial cystitis again making her a less than ideal employee (Tr. 378).

On March 14, 2002, May 9, 2002, June 27, 2002, November 5, 2003, August 6, 2004, September 14, 2004, November 16, 2004, November 2, 2005, and February 7, 2006, Plaintiff was examined by Dr. Abromowitz who noted no apparent physical distress at those times (Tr. 235, 249, 259, 276, 387, 463, 465, 472, 480). Plaintiff underwent

hydrostatic bladder dilation procedures, which provided her relief, on June 27, 2002 (Tr. 255), October 5, 2003 (Tr. 273), July 29, 2004 (Tr. 462), November 15, 2004 (Tr. 467), March 3, 2005 (Tr. 470), November 2, 2005 (Tr. 474), and February 7, 2006 (Tr. 482). These procedures did not require an overnight hospital stay.

With respect to the kidney stones, a May 5, 2005 report indicated kidney stones with no evidence of obstruction (T. 522). On September 11, 2005, Plaintiff was examined by Dr. Ahmad Abouhossein after complaints of abdominal pains and possible kidney stones. (Tr. 529). Dr. Abouhossein noted that there were stones (renal calculi) in both the right and left kidney but that there was no acute obstruction (Tr. 529). A May 2, 2006 report by Dr. Stuart Sorkin also revealed no obstructing kidney stones (Tr. 526-527).

Besides being treated by her family doctor for depression, Plaintiff began seeing a social worker and counselor, Tammy Weber-Gilbert, in March, 2006 (Tr. 539). Ms. Weber-Gilbert indicated that she was treating Plaintiff for "acute pain/chronic pain management, as well as severe depression and anxiety with panic attacks" (Tr. 540). Ms. Weber-Gilbert opines that due to Plaintiff's depression and anxiety "as well as reports of physical pain," she is unable to maintain daily functioning (Tr. 542). Ms. Weber-Gilbert indicated "marked" restrictions of activities of daily living, "moderate" difficulties in maintaining social functioning, and "marked" deficiencies in concentration, persistence or pace. (Tr. 547-548).

### III. Hearing Testimony

Plaintiff testified along with vocational expert (VE) William Braunig at a hearing on May 17, 2006 (Tr. 553). She stated that she was married and had three

4

children, ages 5, 7, and 8 (Tr. 556). The last time she worked was in December, 2001 as a client service representative for a financial company (Tr. 556-557).[2] She stated that she is disabled because of symptoms of interstitial cystitis, which cause urinary incontinence and a burning sensation, and renal stone disease, which causes pain (Tr. 557-558). She indicates that she has throbbing and aching pain in her back and sharp pain in her abdomen (Tr. 558). Plaintiff states that she takes Elavil and Elmaron for the Pain, Effexor for depression and pain, Ambien for sleep, and that she takes either Vicodin or Darvocet for pain every day (Tr. 559, 562). Her medications cause fatigue and make her body feel like "lead" (Tr. 562).

Plaintiff states that she had no limitations in walking, standing, climbing stairs (except that she gets winded), or sitting but that she is most comfortable laying down (Tr. 562-563). As to her activities, Plaintiff states that she drives everyday, takes her children to school, occasionally visit relatives and friends, talks on the phone, cooks for her family, does dishes, sweeps and mops, vacuums, does laundry, uses the computer, goes out to eat, goes to church, goes to the movies, reads, walks, and goes on overnight trips (Tr. 561, 563-564). With respect to housework, Plaintiff states that her husband also does chores (Tr. 563-564). On a typical day, Plaintiff would get up, get the kids ready and take them to school, have breakfast and take medication, rest, pick one child up at 12:15 p.m., have lunch, play games with the child or watch a movie, sometimes do housework, pick up her other children at 3:00 p.m. and then rest followed by dinner (Tr. 566-568).

---

[2] Plaintiff had stopped working full time years earlier and was working part-time when she quit in December, 2001.

Upon examination by her attorney, Plaintiff elaborated on the effects of her conditions. She states that the interstitial cystitis causes throbbing in her back and burning upon urination and that the kidney stones cause back pain and nausea (Tr. 569-570). The pain becomes worse when a kidney stone obstructs her ability to urinate and she has undergone 2 or 3 surgeries to remove such an obstruction (Tr. 570). Her pain levels vary from day to day from a level 2 (out of 10) to a 10, (representing the worst pain) and impacts her level of concentration and her short-term memory (Tr. 570-571). She also needs to urinate between 10 (on a "good day")and 20 (on a "bad day") times a day (Tr. 572). She has 3 "bad days" a week where she does nothing (i.e. does not shuttle her children to and from school, do housework, or engage in social activities) (Tr. 572). Plaintiff states that her pain would prevent her from maintaining a full time job (Tr. 577).

The ALJ posed the following hypothetical to the VE: "If we assume a hypothetical person of claimant's age, education, past work experience . . . let's assume the person should not do beyond medium exertion work. Should have easy access to restrooms; low stress jobs; not fast paced, dealing with public is not precluded. The person should not have production quotas . . . ." (Tr. 579). The VE testified that such a person could not do Plaintiff's past relevant work (Tr. 579). However, the VE testified that there were approximately 9,000 medium exertional level jobs, like janitor and house cleaner, 12,000 light exertional level jobs, like office helpers, photocopy machine operators, and 4,800 sedentary jobs, like weight tester and type copy examiners, in the regional economy (Tr. 579-580). The VE also offered the opinion that if a person needed to take 4 to 8 non-scheduled breaks a day

6

of 4 to 5 minutes to use the restroom, such absences would not be tolerated by an employer (Tr. 580-581). In addition, an absence of 2 or more times per week would not be acceptable in a full-time job situation (Tr. 581).

**IV. ALJ's Determination**

The ALJ first noted that because of Plaintiff's earnings records, she must show that she was disabled prior to December 31, 2006.

ALJ Padilla found that Plaintiff had two severe conditions: interstitial cystitis and a history of chronic, usually non-obstructive kidney stones (Tr. 32-33). He found her psychological condition non-severe (Tr. 33-35) and indicated that there was no objective evidence of fibromyalgia or negative side-effects from scoliosis (Tr. 35). The ALJ then went through the medical evidence and, in significant detail, rejected the opinions of Plaintiff's family doctor, Dr. Zwiesler, rejected the opinion of the social worker, Ms. Gilbert, rejected the functional limitations expressed by Dr. Oza (an agency doctor), and noted that Dr. Abromowitz's treatment notes did not support the functional limitations advocated by Plaintiff. ALJ Padilla also found that while Plaintiff's was credible in the sense that she had a severe impairment, she was not credible on the issue of whether she was totally disabled, that is, she was not credible with respect to functional limitations. The ALJ went so far as to note: "The claimant appeared physically fit at the hearing and she showed no signs of any physical or other discomfort during the one-hour hearing. She presented as overly defensive and qualified all answers" (Tr. 41).

**DISCUSSION**

I. **Legal Standard**

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If the claimant does not qualify under one of the listed impairments,

the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's RFC is evaluated to determine whether the claimant can pursue his past work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform his past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id.*

## II. Analysis

Plaintiff makes two arguments: that the ALJ erred in his credibility determination and that he erred in finding that Plaintiff could maintain a job notwithstanding her frequent need to use the bathroom.

The ALJ found that Plaintiff was not credible with respect to her assertions of disabling pain, lack of concentration, and failing sort-term memory. Plaintiff

9

argues that the ALJ erred in finding that she did not have a "serious condition in June 2002" that coincided with her alleged onset date (or that she stopped working because of her medical condition), that the ALJ erred in requiring an overnight hospital stay as an indicator of disability, that the ALJ ignored evidence of Plaintiff's "good days" and "bad days," and that the ALJ erred in appropriately analyzing Plaintiff's depression and its symptoms. Plaintiff's arguments miss the mark in that the ALJ considered Plaintiff's entire treatment history in determining that her statements of disabling pain and functional limitations are not credible. Thus, the ALJ's determination was supported by substantial evidence.

With respect to the "no serious condition in June 2002" (Tr.40) statement and the lack of overnight hospitalization, it is clear that the ALJ was referring only to Plaintiffs interstitial cystitis. With respect to that condition, the ALJ noted, in the same paragraph, that her diagnosis in June 2002 of interstitial cystitis did not relate to her inability to maintain even a part-time job because she had already stopped working in December 2001. The ALJ further noted that the condition did not require hospitalization (at the time of diagnosis) nor was there "any well-documented complaints related to the cystitis other than intermittent complaints of abdominal and/or flank pain . . . ."(Tr. 3, 40). The ALJ did not require hospitalization as a proxy for disability – he merely pointed out that there was no hospitalization for the condition at that time. The ALJ also indicated that Plaintiff's renal stone disease had been diagnosed years earlier in 1997 (Tr. 32) and that in February, 2002 she had "flank pain" and was treated for kidney stones in May, 2002. Moreover, while Plaintiff's renal stone disease necessitated evaluations

and occasional surgery, clinical findings revealed mostly non-obstructive kidney stones. In addition, as noted above, the ALJ recognized that both the interstitial cystitis and the renal stone disease represented severe impairments. Finally, the ALJ's reference to Plaintiff's pregnancy as being the reason she stopped working is of no import. *Halsell v. Astrue*, 2009 WL 4913322, *5 (7th Cir. 2009) ("[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are . . .").

Plaintiff next argues that the ALJ ignored evidence of Plaintiff's "good days" and "bad days." On bad days, which occur three times a week, Plaintiff states that she is in bed on those days and doesn't do "anything" (Tr. 572-573). The ALJ does not mention these good days and bad days in his opinion; however, Plaintiff's claims of functional limitations are addressed by the ALJ. Plaintiff's arguments are therefore related to whether the ALJ erred in assessing Plaintiff's complaints and characterization of her functional capacity (and those of her doctors) in light of these diseases and the medical evidence. Such credibility assessments are "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Such assessments will not be overturned unless they are patently wrong. *Eichstadt v. Astrue*, 534 F.3d 663, 667-668 (7th Cir. 2008). The Court finds that the ALJ's determination on credibility is not patently wrong and that the ALJ's conclusion is supported by substantial evidence. *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).

The ALJ rejected much of Dr. Zwielser's conclusions of pain and/or limitations with respect to Plaintiff's urological conditions because she was not

11

Plaintiff's treating physician for those conditions and because some of the records were internally inconsistent. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (treating physicians opinion may be rejected if it is internally inconsistent). For example, the intake note from an April 14, 2005 visit to Dr. Zwiesler indicated "minimal pain now" but the doctor's note on that date stated "patient has a lot of pain" (Tr. 515). The ALJ also implicitly rejected Dr. Zwiesler's conclusions because they were based solely on Plaintiff's subjective statements and not on clinical findings. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (a treating physician's opinions may be discounted if based solely on a claimant's subjective complaints). The ALJ indicated that Dr. Zwiesler, in the May, 2005 letter, merely repeated Plaintiff's statement that she had a lack of concentration and ability to remember (Tr. 33). There were no actual clinical findings to support such a conclusion (Tr. 33). As such, the ALJ correctly discounted Dr. Zwiesler's opinion.

The ALJ also found that Dr. Abramowitz's opinions as to Plaintiff's functional limitations were "equivocal." (Tr. 38). As pointed out by the ALJ, Dr. Abramowitz's March, 2005 letter at once stated that Plaintiff is "totally medically disabled" but also stated that while it would be "quite difficult" for Plaintiff to hold a job, there may be some "potential" job that she could accomplish in certain circumstances (Tr. 38, 378). The ALJ is not required to accept wholesale a treating physician's conclusion that Plaintiff is disabled. *See* 20 C.F.R §§ 404.1527(e)(1)-(e)(3); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The ALJ noted that most of Dr. Abramowitz's exams were normal, that Plaintiff saw him less frequently after late 2003, and that she was not in any acute distress during those visits (Tr. 38-39).

And, notwithstanding Plaintiff's visits to emergency rooms and representations of severe pain, she was observed as being in no acute distress (Tr. 39). Finally, Plaintiff's testimony regarding her daily activities on her "good days" show a level of functioning that belies her representation that she is totally unable to work. The ALJ also observed Plaintiff at the hearing and based on that observation found her less than credible. Plaintiff has presented no evidence that would show that a credibility assessment based on these factors is patently wrong.

Plaintiff next argues that the ALJ erred in considering Plaintiff's psychological condition; and in particular discounting Ms. Weber-Gilbert's opinion. As to Plaintiff's own representations of her deteriorating mental state, the ALJ found her not credible for the reasons stated above. That is, the medical record, in particular Dr. Zwiesler's treatment notes, indicated that her condition was stable (Tr. 33). Dr. Zwiesler also gave a good prognosis in May 2005 and there were no clinical findings with respect to lack of concentration and memory loss. Indeed, Plaintiff was observed being prompt and regular in attendance at her appointments and she acted appropriately (Tr. 33). Dr. Zwiesler also did not recommend that Plaintiff see a mental health specialist. As the ALJ noted, it was not until Plaintiff began seeing Ms. Weber-Gilbert, two months prior to the hearing, that her mental condition worsened. The ALJ noted that Ms. Weber-Gilbert was not a psychologist, that she diagnosed severe conditions, that she had only been treating Plaintiff for two months, and that there are no treatment notes. *See* 20 C.F.R. § 416.913 (listing acceptable medical sources, of which social worker or counselor is not). Ms. Weber-Gilbert's assessment of plaintiff was in stark contrast to the medical record and

13

unsupported by any clinical findings. The ALJ correctly discounted Ms. Weber-Gilbert's diagnosis of severe impairments because it was not consistent with Dr. Zwiesler's treatment notes. *Smith v. Apfel*, 231 F.3d 433, 441 (7th Cir. 2000) (noting that a doctor's opinion can be rejected if it is not supported by clinical signs and findings or if it is inconsistent with other evidence in the record). Indeed, when plaintiff complained to Dr. Zwiesler around the same time, she merely continued her medication and added "BuSpar for augmentation" with a note to see her again in four weeks (Tr. 552).

With respect to Plaintiff's urinary incontinence and ability to maintain a job, the hypothetical posed to the VE included "easy access to restrooms" (Tr. 579). Plaintiff argues that the phrase "easy access" is ambiguous and requires remand.

When taken out of context, the phrase "easy access" could be ambiguous and may suggest only that Plaintiff's job site have bathroom facilities that are not burdensome to reach. However, when taken in context, the phrase also reasonably means that Plaintiff would be able to reasonably avail herself of bathroom facilities as needed. Plaintiff testified that she would need to use the bathroom 10 to 20 times a day (Tr. 572). In a follow-up question, her attorney asked:

> Q. If you were offered a job where you could go and sit most of the day or if you got uncomfortable sitting you could stand. Would be a low stress job where you wouldn't have to even perhaps deal with the public, just work at your own pace at your own job site. You'd have *access* to restroom facilities, you couldn't go constantly but if you had to go perhaps three times a day, four times a day, you could excuse yourself if it wasn't a break time. Do you think that you could reliably maintain even a job like that?
>
> A. Reliably?

14

> Q. Yes. To be there every day when scheduled, to be there all day, every day when scheduled.
>
> A. I don't think so. I think my pain would prohibit that.

(Tr. 576-577) (emphasis added).

Thus, Plaintiff was not so much concerned with frequency of bathroom breaks in maintaining a job as she was with the limitations of pain. As noted above, the ALJ reasonably found that Plaintiff's assertion of pain are not credible. Moreover, the 20 bathroom visits that Plaintiff stated she needed to make on a "bad day" also was necessarily rejected because the ALJ also found that Plaintiff was not credible in describing limitations on these "bad days." Plaintiff also testified that she had no functional limitations with respect to walking, standing, and climbing stairs (Tr. 562-563). From Plaintiff's testimony and counsel's questioning, the ALJ was aware that gaining mere access to an out-of-the-way or inaccessible bathroom would not be a problem for Plaintiff and that, instead, the issue was whether Plaintiff would have use of bathroom facilities on a reasonably regular basis. The ALJ's use of the word "access," then, to include frequency is reasonable in light of the questions posed by Plaintiff's attorney prior to the VE's testimony and Plaintiff's own testimony disavowing functional limitations.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 11) is DENIED and Defendant's Motion for Summary Affirmance (Doc. 13) is GRANTED.

CASE TERMINATED


Entered this <u>9th</u> day of April, 2010

      s/ Joe B. McDade  
JOE BILLY MCDADE  
Senior United States District Judge
